44 July 1, 2026 No. 593

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LUIS JAVIER OLMOS MUNOZ,
aka Luis Javier Olmosmunoz,
*Defendant-Appellant.*

Clackamas County Circuit Court
22CR50305; A181680

Ann M. Lininger, Judge.

Argued and submitted June 17, 2025.

Neil Francis Byl, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

POWERS, J.

Conviction on Count 2 reversed and remanded; remanded for resentencing; otherwise affirmed.

**POWERS, J.**

In this criminal case, defendant appeals from a judgment of conviction for felon in possession of a firearm (Count 1), ORS 166.270(1), and felon in possession of a restricted weapon—a dagger (Count 2), ORS 166.270(2). In his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress. Defendant first argues that the court erred in determining that Deputy Wass had reasonable suspicion to stop and investigate him for unlawful entry into a motor vehicle, which is commonly referred to as "car prowling." In the alternative, defendant contends that, even if Wass had a valid reason for stopping him, the subsequent searches of his person and car were not supported by defendant's consent, a search-incident-to-arrest, or inevitable discovery through a valid inventory. In his second assignment, defendant asserts that the trial court erred in denying defendant's demurrer, maintaining that ORS 166.270 violates the Second Amendment to the United States Constitution on its face and as applied to him.

We address the assignments of error in reverse order because the second would provide greater relief than the first. As to defendant's second assignment challenging the denial of his demurrer, the arguments raised on appeal are controlled by our prior decisions. Accordingly, we conclude that the trial court did not err in denying defendant's demurrer. Turning to defendant's challenge to the denial of the motion to suppress in his first assignment of error, we begin by concluding that the trial court erred in determining that Wass had reasonable suspicion to stop him for suspected car prowling because there was insufficient evidence of an objectively reasonable belief that defendant was the reported car prowler. We further conclude that the state failed to show that the dagger would have been inevitably discovered through proper police procedures absent Wass's suspicion of car prowling, and thus the trial court erred in denying defendant's motion to suppress evidence of the dagger. We also conclude, however, that the state offered sufficient evidence to prove that Wass inevitably would have discovered the firearm through an inventory search of defendant's vehicle, and thus the court did not err in denying

defendant's motion to suppress the firearm. Accordingly, we reverse defendant's conviction for felon in possession of a restricted weapon, remand for resentencing, and we otherwise affirm.

## BACKGROUND

We begin with a brief recitation of the undisputed background facts and provide further details in our discussion of each assignment of error.

Just after 2:00 a.m., Clackamas County Sheriff's Deputy Wass received two reports of suspected car prowling. He explained that two people had observed on their Ring cameras someone driving around their neighborhood and getting out of a white car and pulling car door handles. The reports came from two housing developments in "close proximity" to each other. Wass drove to the area and saw a red vehicle—driven by defendant—coming out of a development in the area of the reports that was driving "rather slowly." Wass testified that at the time he saw the vehicle, it was about 10 minutes after the reports and it was the only vehicle in the area at that time. Wass clarified that the vehicle was reported to be white, but that, because Ring cameras provide black-and-white images, a red car could appear white on camera. Wass followed the vehicle but was unable to read the license plate because it had a plate cover over it that had condensation. After Wass saw the vehicle drive on the double yellow line, he pulled the vehicle over and talked with the driver, who was defendant.

When Wass first contacted defendant, he asked for his license and learned that it was suspended. Wass continued speaking with defendant, including asking questions about where defendant was coming from and what he was doing in the area, and defendant responded that he was visiting his girlfriend and was taking back roads rather than the highway because of vehicle issues.

About 10 minutes into the stop, Wass asked defendant to step out of the vehicle. Defendant told Wass that he had a knife on his person, which Wass learned was a "dagger." Later in the interaction, defendant told Wass that there was a firearm in the vehicle. Wass detained defendant, gave

him *Miranda* warnings, and put defendant in the back of his patrol car. Wass ultimately searched the vehicle and found the firearm under the driver's seat. Defendant was subsequently arrested and charged with one count of felon in possession of a firearm and one count of felon in possession of a restricted weapon for possession of the dagger. Before trial, defendant filed a demurrer challenging his charges. He also filed a motion to suppress all evidence seized from defendant during and after the stop, including the dagger and firearm.

The primary issue at the suppression hearing was whether Wass could stop defendant and ultimately search his vehicle. The trial court concluded that Wass had objectively reasonable suspicion to stop and investigate defendant for car prowling and that the dagger and firearm were found pursuant to a valid investigation. The court further concluded that there was probable cause for the stop based on two traffic violations—having an obscured license plate and driving over the yellow line. As to the search of the vehicle, the court found alternative bases that justified the search, including defendant's consent and the search-incident-to-arrest warrant exception. The court further found that there was a valid written inventory policy, and that the firearm was found pursuant to a valid inventory. Ultimately, the court denied the motion to suppress. Defendant waived his right to a jury and was tried to the court in a stipulated facts trial. The court found him guilty on both counts. This timely appeal follows.

## CHALLENGE TO THE DENIAL OF THE DEMURRER

We begin with defendant's second assignment of error in which he contends that the trial court erred in denying his demurrer. Defendant asserts that the felon in possession statute, ORS 166.270, violates the Second Amendment to the United States Constitution on its face and as applied to him. In response, the state first argues that defendant failed to preserve his argument that ORS 166.270 is unconstitutional as applied to him. The state also maintains that the court did not err in denying defendant's demurrer because ORS 166.270 is capable of constitutional application.

We agree with the state's argument that defendant did not preserve his as-applied challenge. Because defendant failed to preserve his argument, our review would be limited to plain-error review. *See generally State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) (explaining that the general rule is that "an issue not preserved in the trial court will not be considered on appeal"); ORAP 5.45(1) (allowing discretionary review of "plain" errors). However, defendant has not asked us to review for plain error, and therefore we do not do so. *See State v. Ardizzone*, 270 Or App 666, 673, 349 P3d 597, *rev den*, 358 Or 145 (2015) (explaining that "we ordinarily will not proceed to the question of plain error unless an appellant has explicitly asked us to do so"). Moreover, even if we did review for plain error, any error is not obvious because our case law has rejected similar as-applied challenges in other cases where the defendant's underlying felony was nonviolent. *See, e.g.*, *State v. Shelnutt*, 309 Or App 474, 478-79, 483 P3d 53, *rev den*, 368 Or 206 (2021) (rejecting as-applied challenge to ORS 166.270 when the underlying felony was unlawful possession of methamphetamine); *State v. Parras*, 326 Or App 246, 257-58, 531 P3d 711 (2023), *rev dismissed as improvidently allowed*, 373 Or 284 (2025) (rejecting as-applied challenge to ORS 166.270 when the defendant's underlying felonies were manufacture and possession of methamphetamine).

We further summarily reject defendant's argument that ORS 166.270 is facially unconstitutional given our prior decisions, including *Parras* and *Shelnutt*, which demonstrate that ORS 166.270 is capable of constitutional application. *See State v. Sutherland*, 329 Or 359, 365, 987 P2d 501 (1999) (explaining that, "[f]or a statute to be facially unconstitutional, it must be unconstitutional in all circumstances, *i.e.*, there can be no reasonably likely circumstances in which application of the statute would pass constitutional muster"). Although defendant asserts that *Parras* was wrongly decided, we are not persuaded that that case was "plainly wrong." *See State v. Civil*, 283 Or App 395, 417, 388 P3d 1185 (2017) (explaining that our standard for overruling precedent is that the decision must be "plainly wrong," which is a "rigorous standard, satisfied only in exceptional circumstances"). Accordingly, we reject defendant's second assignment of error.

CHALLENGE TO THE DENIAL OF THE
MOTION TO SUPPRESS

Turning to defendant's first assignment of error, which challenges the denial of his motion to suppress, we review a trial court's ruling on a motion to suppress for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In so doing, we are bound by the court's factual findings if there is constitutionally adequate evidence to support them. *Id.* If the court did not make express findings of fact on all pertinent issues, we "presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.*

We first address defendant's argument that Wass did not have objectively reasonable suspicion to stop and investigate defendant for car prowling. Defendant contends that, although Wass subjectively believed that defendant was the reported car prowler, his belief was not objectively reasonable. The state remonstrates that under the totality of the circumstances—including the two reports of car prowling in the area, that Wass saw defendant's vehicle 10 minutes following the reports and it was the only vehicle in the area, that a red car could appear white in a black-and-white camera, and that defendant was driving slowly late at night—were sufficient specific and articulable facts to support objectively reasonable suspicion. We disagree with the state's argument.

Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" For an officer to conduct a criminal investigative stop, the officer must have "reasonable suspicion" that a person committed, or is about to commit, a crime. *State v. Maciel-Figueroa*, 361 Or 163, 170, 389 P3d 1121 (2017). Reasonable suspicion exists if an officer subjectively believes that an individual has committed, or is about to commit, a crime, and the officer's belief is objectively reasonable under the totality of the circumstances. *Id.* at 182. An officer's subjective belief is objectively reasonable when the officer can point to specific and articulable facts that support a reasonable inference that the

defendant has committed or is about to commit the crime that the officer suspects. *State v. Holdorf*, 355 Or 812, 825, 333 P3d 982 (2014).

Here, we conclude that the trial court erred in determining that Wass had objectively reasonable suspicion that defendant was car prowling because there were insufficient specific and articulable facts to support his subjective belief. The only information that Wass had prior to seeing defendant's vehicle was from two reports around 2:00 a.m. that a person driving a white vehicle was attempting to open car doors in two housing developments in "close proximity" to each other. When Wass arrived in the area about 10 minutes following the reports, he saw defendant driving a red vehicle "rather slowly" and testified that it was the only vehicle in the area. That was insufficient. Although Wass testified that a red vehicle could appear white on a black-and-white Ring camera, without more details about the vehicle or a description of the driver, those facts are insufficient to support objectively reasonable suspicion that defendant was the driver of the reported vehicle. The difficulty with the state's argument is that Wass would have had reasonable suspicion to stop any light-colored vehicle that was driving "slowly" in the area at that time. The state constitution requires more.

Although the late hour and the fact that defendant was in "close proximity" to the area 10 minutes following the reports are relevant circumstances, those facts do not outweigh that Wass did not have more specific objective indications that defendant was the reported car prowler. *Compare State v. Blackstone*, 289 Or App 421, 433-34, 410 P3d 354 (2017) (concluding that the officer lacked objectively reasonable suspicion when the report came from another officer who saw suspicious individuals but no one had reported a crime, and the officer stopped a person who did not match the reported description, and noting that the proximity to the scene and the late hour were insufficient to tip the scales), *with State v. Brown*, 298 Or App 771, 779-81, 446 P3d 568, *rev den*, 365 Or 819 (2019) (concluding that the officer had objectively reasonable suspicion when the defendant matched the physical description in the report, the defendant was found around 1:00 a.m., just three minutes

following the report and one block away from the reported crime scene, and he was the only person in the area). Without more evidence to establish an objectively reasonable belief that defendant was involved in the suspected car prowls, Wass's belief that he had identified the correct person was "mere speculation." *See State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019) (explaining that reasonable suspicion requires "more than mere speculation").

Although we conclude that the trial court erred in concluding that Wass had reasonable suspicion to conduct an investigative stop of defendant for car prowling, the parties agree that he had probable cause to stop defendant for two traffic violations, and thus we must consider the scope of Wass's investigation. The parties dispute on appeal whether Wass's investigation into car prowling occurred immediately upon stopping defendant or whether Wass's initial investigation was for the traffic violations, because the body camera footage does not start at the beginning of the stop. Despite the lack of body camera footage, there is testimony from Wass that, after confirming defendant's driving status, he began to talk to defendant about his suspicion of car prowling. Moreover, the trial court found that "Wass pulled the Defendant over, he learned that the Defendant was driving without a valid license. He had a suspended license. He talked to him about the concern about car prowling \*\*\*." Therefore, the trial court explicitly found, and the record supports, that the investigation into car prowling occurred at the beginning of the stop immediately upon Wass learning that defendant was driving with a suspended license. In sum, because we conclude that Wass did not have objectively reasonable suspicion that defendant was car prowling, any subsequent investigation into car prowling was improper. *See State v. Arreola-Botello*, 365 Or 695, 712, 451 P3d 939 (2019) (concluding that investigative activities and inquiries during a traffic stop must be reasonably related to the purpose of the traffic stop or be supported by an independent constitutional justification); *State v. Allen*, 314 Or App 735, 739, 497 P3d 777 (2021) (discussing *Arreola-Botello* and observing both that it is "the justification for the stop that delineates its lawful bounds," and that by "applying subject-matter limitations to investigative activities and

questioning, Article I, section 9, ensures that officers do not turn minor traffic violations into criminal investigations" (internal quotation marks and citation omitted)).

Thus, we need not reach the question of whether defendant's consent or search-incident-to-arrest justified the search for the firearm because the events supporting those potential warrant exceptions were tainted by Wass's investigation into car prowling. *See State v. Jackson*, 268 Or App 139, 151, 342 P3d 119 (2014) (explaining that when the "state has obtained evidence following the violation of a defendant's Article I, section 9 rights, it is presumed that the evidence was tainted by the violation and must be suppressed"). However, because the parties do not dispute that Wass had probable cause to stop defendant for two traffic violations, we must consider the state's argument that the dagger and firearm would have been inevitably discovered.

We first conclude that the state failed to prove that it would have inevitably discovered the dagger. To prove inevitable discovery, the state is "required to show by a preponderance of evidence (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *State v. Hensley*, 281 Or App 523, 535, 383 P3d 333 (2016) (internal quotation marks omitted). The state asserts on appeal that Wass would have discovered the dagger through ordinary police procedures. According to the state, after Wass stopped defendant for the traffic violations, he still would have learned that defendant's license was suspended, and Wass would have removed him from the vehicle and asked whether defendant had any weapons on him. Defendant asserts that we should decline to address that argument because the state did not raise it below and the record would have developed differently had the state raised it.

As to whether the dagger was properly discovered, the trial court found:

> "You know, [Wass] saw the bullet on his—kind of in the front part of, I guess, the driver's console, right in front of the driver, which made him concerned that there was a weapon in the vehicle.

"He had—he consensually was told about the dagger in—on [defendant] and then concluded that—and was told by [defendant] that he was not allowed to possess weapons, or that he was a felon and so couldn't possess restricted weapons, and so had reasonable suspicion to believe that there was a violation of that prohibition on a person who has a felony possessing prohibited weapons."

We agree with defendant's argument that, because the state did not raise an argument about the inevitable discovery of the dagger before the trial court, the record may have developed differently. That is, unlike the inevitable-discovery arguments raised before the trial court about the firearm, which we discuss below, there is nothing specific about whether Wass would have found the dagger if he had stopped defendant only for the traffic violations and then found that his license was suspended. Thus, we will not affirm on an alternative basis that the dagger would have inevitably been discovered through proper police procedures absent Wass's investigation into car prowling. Moreover, the state does not establish on appeal that its argument satisfies the requirements for an alternative basis for affirmance. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (setting forth requirements to prove an alternative basis for affirmance). Accordingly, we conclude that the trial court erred in failing to suppress evidence of the dagger.

We turn to whether Wass would have inevitably discovered the firearm through an inventory of defendant's vehicle. For a warrantless search of a vehicle to be considered a valid inventory search, the state must prove that "(1) the vehicle is lawfully in police custody, (2) the inventory policy is properly authorized and designed and systematically administered so that the inventory involves no exercise of discretion by police, and (3) the officer directing or taking the inventory does not deviate from the established policies or procedures." *State v. Fulmer*, 366 Or 224, 231, 460 P3d 486 (2020) (internal quotation marks omitted). Even if an officer suspects criminal activity when deciding to impound or tow the vehicle, the officer's "suspicions can play no part in the discretion that [the officer] exercises when deciding

whether to impound a car." *State v. Gaunce*, 114 Or App 190, 195, 834 P2d 512, *rev den*, 315 Or 271 (1992).

The parties' arguments on appeal focus on the third requirement—whether Wass followed proper procedure. Defendant first argues that the purported "inventory" of defendant's car was invalid because it did not conform with the policy. The state, on the other hand, remonstrates that, if Wass had stopped defendant only for the traffic violations, he still would have towed the vehicle and inventoried it and discovered the firearm because defendant's license was suspended and the vehicle was parked on the street in a way that was hazardous. In his reply brief, defendant asserts that the state failed to establish that Wass would have towed and inventoried defendant's vehicle absent any suspicion that defendant had been engaged in car prowling. Defendant further maintains that, because his girlfriend would have been able to pick up the car, Wass did not have a reason to tow and inventory the vehicle.

As to whether Wass performed a valid inventory, the trial court explained:

> "I found [Wass's] testimony credible, and corroborated by the video, that [defendant] ended up parking in a hazardous place when he pulled over as required to by the deputy, but that he was parked in a hazardous place so that it would support a need to tow the car. * * *
>
> "* * * * *
>
> "Then when we get to—so to the extent that the inventory is a basis for having located the gun, the—there does seem to be an appropriate policy that, you know, created under the auspices of an elected official, the Sheriff, and/or the County Commissioners, but I believe the Sheriff, that indicates the circumstances in which someone may tow a vehicle if they're a law enforcement officer. And we have this exhibit admitted as Exhibit 3, and when one may tow without prior notice, and there is a list of around 16 or 17 reasons when a vehicle may be towed without prior notice, one of which in this 701.080(L) is when there's probable cause to believe that the driver is driving while suspended or revoked, violation of ORS 811.175 or 811.182.

"It doesn't identify every single nuance of discretion that a deputy must work through, but it does give about 16 times when you can. So it's not willy nilly when a vehicle may be towed. And the officer—the deputy did, as he testified, [take an] inventory and fill out the inventory worksheet, and he provided some detail including delineating a radio from cash from miscellaneous and from tools, even if he didn't provide as much detail as the Defense would have sought. And he testified that he provided the inventory, or the worksheet to the Defendant afterwards. So, the deputy did follow a written policy. And I think it's not realistic to hold—to assume that the policy would map out every single nuance of discretion that a law enforcement officer is going to find when they're out on the road addressing a circumstance.

"And so the absence of even more detail about when you can do it I think is not fatal to the validity of the inventory as a basis for legitimately finding that firearm."

In response to an inquiry from the court about whether Wass's subjective belief surrounding his justification for the search was relevant to the analysis, the prosecutor contended that it was not relevant and then outlined the state's argument about the different justifications for the search, including noting that

"the inventory is also there as well, and he would've found the gun, because that's where he would've—he would've looked under there for valuables, I believe he said that. So I don't think that issue about what the deputy was thinking at the point at which he seized the gun is really relevant to the determination of what was the basis for the search and was the search constitutional or not."

The trial court's findings focus primarily on the validity of the inventory policy and whether Wass complied with that policy. However, the court also appears to have implicitly found that Wass would have towed and inventoried the vehicle regardless of defendant's arrest when it noted that it found Wass's testimony credible that defendant was parked in a hazardous place, which supported the need to tow. Those findings are supported by Wass's testimony that his decision to tow the vehicle "was based on the fact that [defendant] was suspended driving. He's not lawfully allowed to drive a vehicle in the state of Oregon if you're

suspended." Wass further testified that he was concerned about where the car was parked, explaining, "Yeah, it's a hazard. I couldn't leave the car there." Moreover, the court was on notice through the prosecutor's arguments that the state believed that Wass "would've found the gun" through an inventory.

As to defendant's argument that the state failed to prove that Wass would have inventoried defendant's vehicle absent a suspicion of car prowling, the court's findings are critical to our analysis. *See Gaunce*, 114 Or App at 196 (remanding to the trial court to make findings on the existing record as to whether the officer would have impounded the defendant's vehicle regardless of the officer's suspicions of criminal activity). In *Gaunce*, the trial court found that the "main reason" that the officer impounded the vehicle was because it was creating a potential traffic hazard. *Id.* at 195 (emphasis omitted). We explained that by specifying that the traffic hazard was the "main reason" for towing, the trial court implicitly found that the officer considered his suspicions about criminal activity when making the decision. *Id.* Here, however, the trial court's express findings were that the car was parked in a hazardous way, which "would support a need to tow the car." The trial court did not make explicit or implicit findings that Wass had any other reason for towing and inventorying the car. Accordingly, we are bound by the trial court's explicit finding that the car needed to be moved because it was parked in a hazardous way, and its implicit finding that Wass would have decided to tow and inventory the car in order to address that hazard and because defendant was unable to move the car by reason of his license suspension.

Finally, defendant asserts in his reply brief that, because defendant's girlfriend was available to retrieve the vehicle, Wass had no reason to tow and inventory the car. *See Fulmer*, 366 Or at 235 (observing that "if the justification for an inventory is protection of a person's property and reduction of false claims, those aims are likely better served by ensuring that as little property as possible makes its way into police custody"). We decline to address that argument because defendant did not make that argument

at the suppression hearing, and thus the court did not make any findings as to whether defendant's girlfriend could have taken the car such that Wass would not have needed to tow and inventory it.

In short, because the court implicitly found that Wass would have towed and inventoried defendant's vehicle after finding out that defendant had a suspended license and because the car was parked in a hazardous way, the firearm would inevitably have been found as part of a proper inventory. Therefore, the trial court did not err in denying defendant's motion to suppress the firearm.

Conviction on Count 2 reversed and remanded; remanded for resentencing; otherwise affirmed.